UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

VINCENT LYLE BADKIN,

               Plaintiff,

  v.

LOCKHEED MARTIN
CORPORATION, a Maryland
corporation, d/b/a LOCKHEED
MARTIN SPACE SYSTEMS
COMPANY; and INTERNATIONAL
ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS,
DISTRICT 160 AND LOCAL LODGE
282, a Washington labor union,

               Defendants.

CASE NO. C17-5910 BHS

ORDER GRANTING
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

     This matter comes before the Court on Defendant Lockheed Martin Corporation's

("Lockheed") motion for summary judgment, Dkt. 20, and Defendant International

Association of Machinists and Aerospace Workers, District 160 and Local Lodge 282's

("the Union") motion for summary judgment, Dkt. 24.[1] The Court has considered the

---

[1] The Court refers to the Union and Lockheed collectively as "Defendants."

pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motions for the reasons stated herein.

## I.   PROCEDURAL HISTORY

On November 2, 2017, Plaintiff Vincent Lyle Badkin ("Badkin") filed suit against Lockheed and the Union. Dkt. 1. Badkin claims Lockeed wrongfully terminated his employment and breached the Collective Bargaining Agreement ("CBA") when it did so and the Union breached its duty to fairly represent him when his employment was terminated. *Id.* ¶ 25–28. On February 13, 2019, Lockheed and the Union both moved for summary judgment. Dkts. 20, 24. On March 4, 2019, Badkin responded to both motions. Dkt. 28. On March 7, 2019, the Union replied. Dkt. 31. On March 8, 2019, Lockheed replied. Dkt. 33. On March 12, 2019, Badkin filed a surreply. Dkt. 36.

## II.   FACTUAL BACKGROUND

Badkin was employed by Lockheed as a senior missile craftsman and support mechanic at Naval Base Kitsap ("the base") in Silverdale, Washington, and was a member of the Union. Dkt. 1, ¶¶ 8–9. Within the base, Badkin worked at the Strategic Weapons Facility Pacific ("SWFP"). *Id.* ¶ 9. The Union was Badkin's exclusive representative with Lockheed. *Id.*

On May 10, 2016, Badkin arrived at his home to discover an acquaintance of his daughter had broken into their house. *Id.* ¶ 10 n.1. Badkin used his handgun to attempt to detain the acquaintance until the police arrived. *Id.* Badkin fired his gun near the acquaintance's feet. *Id.* The acquaintance called 911. Dkt. 20 at 3. Badkin fired seven shots into the acquaintance's car when he attempted to leave. Dkt. 1, ¶ 10 n.1. Badkin

was arrested by the Kitsap County Sheriff's Office and detained on a charge of assault in the first degree. *Id.* ₱ 10; Dkt. 22-3. Badkin was scheduled to work on May 11–13 and 16–19. Dkt. 20 at 4 (citing Dkt. 22-5 at 10). On May 13, 2016, Badkin's daughter McKenna Badkin ("McKenna") contacted Lockheed to inform them that he was in county jail and unable to report to work. Dkt. 1, ₱ 11; Dkt. 20 at 4 (citing Dkt. 22-5 at 3). McKenna spoke with Reshondra McInnis, a manager at Lockheed who was not Badkin's supervisor. Dkt. 20 at 4 (citing Dkt. 22-5 at 3). McKenna then left a voicemail for Troy Quick ("Quick"), Badkin's supervisor. *Id.* at 5 (citing Dkt. 22-5 at 3–4). On May 16, 2016, McKenna again contacted Lockheed to let them know Badkin was still in jail and did not wish to resign his position. Dkt. 1, ₱ 11. McKenna spoke with Lockheed Human Resources Manager Sheri Hendrix ("Hendrix"), who told McKenna that Badkin "must follow reporting procedures or his absences would indicate a resignation." Dkt. 20 at 5 (citing Dkt. 22-5 at 4). On May 20, 2016, Badkin was released pending trial. Dkt. 20 at 4 (citing Dkt. 22-1 at 18).

On May 18, 2016, Quick sent a letter to Badkin terminating his employment based on a failure to report for five scheduled workdays without valid justification. Dkt. 1, ₱ 12. The letter concluded that Badkin's conduct amounted to voluntarily resigning his position under Article 4, Section 2 of the CBA. *Id.* On May 25, 2016, the Navy revoked Badkin's access to the base. Dkt. 20 at 6 (citing Dkt. 22-14).

Badkin talked to Union representative Bob Westbrook ("Westbrook") about what had happened so that Westbrook could draft a grievance opposing Badkin's termination.

Dkt. 1, ¶ 14; Dkt. 20 at 6 (citing Dkt. 22-1 at 29–30). Westbrook drafted the grievance for

Badkin, including the "Corrective Action Desired" section, which reads:

> If Mr. Badkin is absolved of wrong doing as provided in the allegations and
> charges brought against him from this incident, Lockheed Martin will
> provide a recommendation that his previous clearance and base access be
> reinstated, at which time he may be returned to work with no further
> penalty or loss of seniority, at the working rate commiserate [sic] with
> where he would have been had the incident never occurred. In the interim,
> Lockheed Martin agrees not to fight Mr. Badkin's application for
> unemployment.

Dkt. 20 at 6–7 (citing Dkt. 22-1 at 29–30; Dkt. 22-8). On June 15, 2016, Badkin reviewed

and signed the grievance. Dkt. 22-1 at 29–31.

On July 21, 2016, Westbrook emailed Badkin to let him know that Lockheed had

offered settlement terms where if all charges were dropped or dismissed, Lockheed

would permit Badkin to apply to available job openings and would not oppose his claim

for unemployment benefits. Dkt. 1, ¶ 15; Dkt. 22-9 at 4. At this point, Badkin had already

been approved for state unemployment benefits and asked the Union to reject this offer

and continue the grievance because the proposed resolution put him "in no better position

than he already was." Dkt. 1, ¶ 16; Dkt. 22-9 at 3–4. On July 25, 2016, Westbrook

responded "Ok. Just keep in mind that there is no guarantee that the union will take it to

arbitration. Our attorney will review and let me know if he thinks the union would prevail

in arbitration after LOCKHEED provides its formal response to the grievance." Dkt. 22-9

at 3. On August 8, 2016, the Union and Lockheed agreed to settle Badkin's grievance on

three terms: (1) Badkin's termination would be coded as a voluntary resignation; (2) if

Badkin was cleared of all charges he could apply as an external candidate to any open

position; and (3) Lockheed would not contest Badkin's right to collect unemployment benefits. Dkt. 1, ⁋ 17; Dkt. 20 at 8 (citing Dkt. 22-8).[2] Badkin alleges that the Union led him to believe "that if he was absolved of the assault in the first degree charge and his access to Naval Base Kitsap was reinstated, that he would be reinstated at his previous position," but does not tie this belief to a specific event or communication with the Union. Dkt. 1, ⁋ 18.

On September 9, 2016, Badkin entered an Alford plea to a misdemeanor charge of unlawful carrying or handling of a firearm, and the prosecuting attorney dismissed the assault charge. *Id.* ⁋ 19. Badkin did not consult with the Union before entering the plea. Dkt. 20 at 9 (citing Dkt. 22-1 at 72). On September 21, 2016 ("the September meeting"), Badkin met with Westbrook and Union Shop Steward Jamie Nevins ("Nevins"). Dkt. 20 at 9 (citing Dkt. 22-11). The parties dispute what was communicated at this meeting. Westbrook declares that he told Badkin that the Union's attorney "did not think the grievance was strong enough to prevail in arbitration" and that "the Union considered his grievance resolved and that we would not take any further action on the grievance." Dkt. 26, ⁋ 11. Westbrook also declares that after receiving this information, Badkin "was upset and threatened to sue." *Id.* Badkin testified at his deposition that he does not recall threatening to sue the union and that it is false that the Union informed him that they would not take his grievance to the third step. Dkt. 25-1 at 19–20. Westbrook declares

<hr>

[2] The Union informs the Court that "[w]hile one version of the settlement is dated August 8, 2016, the settlement actually was not signed off by the parties until October 28, 2016." Dkt. 24 at 7 n.2 (citing Dkt. 26, ⁋ 9).

that Badkin sent him a text message a few days later that read in part "I'd like to apologize to you for being abrupt the other day but as you might understand it's hard to lose your career at this point in life . . . ." Dkt. 26, ¶ 12.[3]

On January 23, 2017, Badkin received a letter from Captain E.A. Schrader, Commanding Officer of the base, reinstating his access to the base. Dkt. 1, ¶ 21. On April 26, 2017, Badkin informed Westbrook that his base access had been reinstated and he was ready to return to work under his "understanding that the union and Lockheed Martin agreed that I would get my job back after I was absolved of the assault charge and my access to Naval Base Kitsap was reinstated." *Id.* ¶ 22; Dkt. 20 at 10 (citing Dkt. 22-9 at 10). Westbrook told Badkin that he had communicated Badkin's request to Lockheed and hoped they would "take quick action." Dkt. 1, ¶ 22.

On May 8, 2017, Badkin emailed Westbrook, requesting that if Lockheed did not respond to the request to reinstate him, Westbrook "let [him] know whether or not the union will take the next step in the grievance procedure, up to and including arbitration if necessary." Dkt. 20 at 11 (citing Dkt. 22-9 at 12). Westbrook responded, stating "I'm sorry to report that there is a technicality in that you weren't absolved of the wrong doing from the Corrective Action Desired block, which you signed. Since you still have a misdemeanor Lockheed has closed the files on your case." Dkt. 1, ¶ 23; Dkt. 20 at 11 (citing Dkt. 22-9 at 14)

---

[3] During the deposition, Westbrook's handwritten notes from the meeting were offered as an exhibit. Dkt. 25-1 at 18–19. Badkin's attorney objected that the notes were hearsay. *Id.* Badkin's opposition argues that the notes "are hearsay and inadmissible." Dkt. 28 at 10. The Court will treat this argument as a motion to strike.

# III. DISCUSSION

Lockheed and the Union move for summary judgment on two bases: (1) Badkin's claims are barred by the statute of limitations and (2) Badkin cannot meet his burden to prove both of the required prongs of his claim: that Lockheed breached the CBA and that the Union breached the duty of fair representation.

## A. Motions to Strike

Each party asks the Court to strike evidence from consideration. Lockheed Martin asks the Court to strike evidence of negotiation from the summer of 2017 between one of its general counsels and Badkin's counsel regarding his reinstatement. Dkt. 33 at 4.[4] Lockheed argues that the evidence consists of settlement negotiations and cannot be used to establish liability in a case. Dkt. 33 at 5 (citing *Navigators Ins. Co. v. Nat'l Union Fire Ins. Co.*, No. C12-0013-MJP, 2013 WL 4008826, at *6 (W.D. Wash. Aug. 5, 2013)). While the earliest cited email from Lockheed's counsel to Badkin's counsel does not explicitly discuss a threat of suit from Badkin, an email five days later on June 26, 2017 has the subject line "Badkin Settlement Discussions" and opens by stating "[a]s you know, we have had a series of telephone conversations for the purposes of potentially resolving Mr. Badkin's allegations of wrongful termination . . . ." Dkt. 29. The discussion of a series of conversations in the later email supports a reasonable inference that the prior email was also part of settlement negotiations for Badkin's wrongful termination

---

[4] The Court understands this request to apply only to the cited emails regarding potential settlement of a wrongful termination claim by Badkin against Lockheed, not to the earlier discussions between the Union and Lockheed regarding settlement of Badkin's grievance.

claims. The Court finds that the contents of the emails support Lockheed's contention

that they are settlement discussions inadmissible to prove liability under Fed. R. Evid.

408. Therefore, the Court grants Lockheed's motion to strike the relevant portions of Dkt.

29, Declaration of Ahmet Chabuk and the relevant portions of Badkin's response, Dkt.

28. *See* Dkt. 33 at 5.

Badkin moves to strike three sources of evidence. First, during Badkin's

deposition, Westbrook's handwritten notes from the September meeting were offered as

an exhibit. Dkt. 25-1 at 18–19. Badkin's attorney objected that the notes were hearsay. *Id*.

Badkin argues in his response brief that the notes "are hearsay and inadmissible." Dkt. 28

at 10. Because Lockheed and the Union rely on these notes for the truth of what was

stated in the meeting and do not mention the notes in their reply briefs, the Court

construes this as an admission that Badkin's objection has merit and grants the motion to

strike the notes.[5]

Second, Badkin asks the Court to strike two declarations pursuant to Local Rule

7(g). Dkt. 36. The declarations are Dkt. 32, Second Declaration of Robert Westbrook,

and Dkt. 34, Declaration of Sheri Hendrix. *Id.*[6] Badkin argues that these declarations "are

new evidence and not in reply to Plaintiff's response." Dkt. 36 at 2. On one hand,

---

[5] Even if the Court's finding here is incorrect, and even with the likelihood that these notes could be admissible at trial if Westbrook were impeached on his testimony about what occurred at the meeting per Fed. R. Evid. 801(d)(1)(b), any error would be harmless because the Court concludes there is a question of fact about what was communicated at the September meeting, and on summary judgment all evidence must be taken in the light most favorable to Badkin as the nonmoving party.

[6] Hendrix's two declarations in this case are Dkt. 21, filed in support of Lockheed's motion for summary judgment, and Dkt. 34, filed in support of Lockheed's reply brief.

Westbrook's second declaration elaborates on Westbrook's intent while working with Badkin, and therefore is in reply to the allegation in Badkin's response that the Union's handling of his grievance was perfunctory or in bad faith. *See* Dkt. 31 at 3–4 (citing Dkt. 32). On the other, the additional context could have been presented in support of the Union's opening brief, and Badkin does not now have an opportunity to respond. *See Karpenski v. Am. Gen. Life Ins. Co., LLC*, 999 F. Supp. 2d 1218, 1226 (W.D. Wash. 2014) (granting motion to strike when facts introduced on reply should have been introduced in opening brief); *see also Nautilus Group, Inc. v. Icon Health & Fitness, Inc.*, 308 F. Supp. 2d 1208, 1214 (W.D. Wash. 2003) (granting motion to strike declaration with new evidence submitted in reply). The Court finds that Westbrook's actions and decision-making process are one of the central issues in this case and that the Union could have presented the more comprehensive picture of Westbrook's thoughts and actions in his declaration supporting their opening brief. Therefore, the Court will grant the motion to strike Westbrook's Second Declaration, Dkt. 32.

Similarly, the Court finds Hendrix's declaration presents additional facts about Lockheed's absence-reporting policies and about why a HR designation of voluntary resignation would benefit Badkin if he were rehired. Dkt. 34. Because there is no reason these facts could not have been presented earlier, the Court will grant the motion to strike to the extent these facts were not presented in Lockheed's opening brief.

**B.      Summary Judgment**

    **1.      Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically

attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

## 2.   Statute of Limitations

The parties agree that Badkin's suit is governed by the six-month statute of limitations borrowed from section 10(b) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(b), for lawsuits which combine claims for an employer's breach of a collective-bargaining agreement under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, with claims against a union for its breach of the duty of fair representation. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 165–70 (1983); Dkt. 20 at 16; Dkt. 28 at 8. The claims are known as hybrid § 301/fair representation claims. *DelCostello*, 462 U.S. at 165. The parties dispute when Badkin's cause of action accrued.

### a.   Standard for Claim Accrual

In the Ninth Circuit, a fair representation claim "generally begins when an employee knows or should know of the alleged breach of duty of fair representation by a union." *Galindo v. Stoody Co.*, 793 F.2d 1502, 1509 (9th Cir. 1986). In the context of processing a grievance, "the simplest case is one where a union decides not to file a grievance; the cause of action generally accrues when the employee learns or should have learned of the union's decision." *Id*. If the claim attempts to overturn an arbitration award

because of the union's error in the proceedings, "the claim accrues when the employee learns of the arbitrator's award." *Id*.

Lockheed argues that under the standard in *Galindo* Badkin's claim accrued when he "knew or reasonably should have known that the union was not going to pursue [his] grievance," framing the failure to progress the grievance as the operative breach alleged. Dkt. 20 at 16 (citing *Galindo*, 793 F.2d at 1509–10). Badkin counters that according to *Price v. S. Pac. Transp. Co.*, 586 F.2d 750, 754 (9th Cir. 1978) the operative date for the statute of limitations is the last act by the union "of any consequence." *Price* involved a plaintiff who was discharged and whose union wrote to the employer asking that he be reinstated on a leniency basis. *Id*. at 751. The court described the day of the employer's denial of the request as one "at which any injury to [the plaintiff] allegedly caused by the Union became fixed and reasonably certain." *Id*. at 752–54. The standard in *Galindo* and the standard in *Price* do not appear to necessarily conflict, as the time of the breach of duty, *Galindo*, 793 F.2d at 1509, could also be the time when injury to the plaintiff becomes "fixed and reasonably certain," *Price*, 586 F.2d at 752–54.

### b.    Facts of Claim Accrual

Defendants put forward two dates more than six months before Badkin filed his suit on which the Court could find Badkin's cause of action accrued. First, Lockheed argues that Badkin's cause of action accrued as of the September meeting "when he was informed, in unequivocal terms, that the Union saw no merit to his grievance and would not be taking his grievance to arbitration." Dkt. 20 at 16 (citing Dkts. 22-11, 22-15). Westbrook declares that at the meeting (1) he told Badkin he had reviewed the grievance,

the plea deal, and Lockheed's settlement with the Union's attorney, (2) the attorney did

not think the grievance would prevail in arbitration, and (3) the Union had decided not to

take the grievance any further. Dkt. 26, ¶ 11. The Union argues that Badkin "gave a series

of conflicting answers" in his deposition when asked "whether Westbrook informed him

[at the September meeting] that his grievance lacked merit." Dkt. 24 at 12 (citing Dkt. 25-

1 at 17). Earlier in the deposition, Badkin stated that he did not recall being told the

grievance lacked merit. Dkt. 25-1 at 17. Later, Badkin stated that Westbrook did not tell

him the grievance would not be pursued and did not tell him the Union had consulted

with legal counsel. *Id*. at 30. Badkin argues that there is a dispute of fact as to whether he

became aware at this meeting that the Union would not take further action on his

grievance, based on his deposition testimony that he did not recall being told his

grievance had no merit and would not be advanced to arbitration. Dkt. 28 at 10 (citing

Dkt. 25-1 at 20, 30).

While Badkin's statements do appear somewhat contradictory, the Court finds that

taking the facts in the light most favorable to Badkin as the nonmoving party, he has

established a material question of fact. Therefore, the Court denies Defendants motion on

the issue of whether Badkin's cause of action accrued in September 2016.

Second, even if Badkin did not understand what was allegedly communicated to

him at the September meeting, Lockheed argues that he should have known the grievance

was terminated when he communicated with the Union about job openings between

September 2016 and April 2017 but never mentioned the grievance. Dkt. 20 at 17.

Lockheed argues that Badkin is charged with constructive knowledge of the time limits in

the CBA and that grievances are considered waived under Article 3 of the CBA if not advanced to the next step within seven or fourteen days. Dkt. 20 at 17 (citing *Metz v. Tootsie Roll Indus., Ind.*, 715 F.2d 299, 304 (7th Cir. 1983); *Eason v. Waste Mgmt. of Alameda Cty.*, No. C-06-06289 JCS, 2007 WL 2255231, *7 (N.D. Cal. Aug. 3, 2007) (collecting cases supporting the proposition that courts routinely find that employees subject to collective bargaining agreements are charged with constructive knowledge of the terms)).  The Union also asks the Court to follow the Seventh Circuit's decision in *Metz* that a plaintiff whose union did not respond to her request may not claim lack of notice that the union is not proceeding on the grievance without more. Dkt. 24 at 10 (citing *Metz*, 715 F.2d at 304).

On the facts at bar, the Union explains that "[i]n the case of a termination, the grievance procedure begins at the third step of the process" and "[i]f a termination grievance is not settled at the third step, then a written demand to arbitrate must be filed within thirty days of the step three response." Dkt. 24 at 4 (citing Dkt. 26). The CBA also states that "management shall give their written response within seven (7) calendar days of the Step Three meeting." Dkt. 22-2 at 19.  In contrast to *Metz*, where the Seventh Circuit explained that the grievance proceedings would be exhausted if not taken to arbitration in twenty-three days, 715 F.2d at 303, the facts in this case do not clearly establish that the CBA's strict time limits were rigorously followed. For example, the Union explains that following submission of Badkin's written grievance and a meeting between the Union and Hendrix in July 2016, "[o]ver the next couple months, the Union and Lockheed continued discussing possible settlement terms to resolve the grievance."

Dkt. 24 at 6 (citing Dkt. 26, ¶ 6). Incorporating the dispute of fact regarding what Badkin was told at the September meeting, it is plausible that even if charged with constructive knowledge of the grievance processing deadlines in the CBA, Badkin could have reasonably concluded that those deadlines were not being applied in his case because (1) the grievance was initiated mid-June, (2) he received an update on settlement discussions in July, and (3) he received another "update" at the September meeting. Therefore, the Court finds that the facts of *Metz* are distinguishable and concludes that it cannot be established as a matter of law that Badkin should have known the Union was not taking his grievance to arbitration between September 2016 and mid-April 2017.

Lockheed and the Union next argue that Badkin's April 26, 2017 email to Westbrook asking to be reinstated under the terms agreed to between the Union and Lockheed shows certain knowledge that the Union was not proceeding with his grievance. Dkt. 20 at 17; Dkt. 24 at 13. The Union notes that Badkin also sent Westbrook a letter on the same date. Dkt. 24 at 13 (citing Dkt. 26-7). Counting from this April 26, 2017 email, the statute of limitations would have expired on October 26, 2017, seven days before Badkin filed suit on November 2, 2017. Dkt. 20 at 17. The contents of Badkin's email and letter are somewhat contradictory.

In the email, Badkin explains that the assault charges against him were dropped in September 2016 and his access to the base was restored in January 2017. Dkt. 26-6. He states that "[i]t is my understanding that the union and Lockheed Martin agreed that I would get my job back after I was absolved of the assault charge and my access to Naval Base Kitsap was reinstated." *Id.* This email appears to communicate that he believed

Lockheed and the Union resolved his grievance in his favor, he had satisfied the conditions in the grievance, and he was eligible to return to work.

The seven-page letter conveys a substantially different sense of Badkin's perception of the state of affairs, opening with the following paragraph:

> Mr. Westbrook I am writing you this letter with the hope that you will please take some time in your busy schedule to read it and that you may gain further insight to the travesty that affected our lives and the dire situation that we are in now. Our hope is that you will come to see the truth and consider supporting our position.

Dkt. 26-7 at 2. It provides a comprehensive description of Badkin's skills, military experience, and employment history and states that "I am now humbly asking you most respectfully to consider support in my grievance with Lockheed Martin, as I believe the outcome of my case as the <u>victim of a crime</u>, warrants its reassessment." *Id*. at 3. It provides a highly detailed description of Badkin's version of the events surrounding his arrest, argues that the Kitsap County Prosecutor's Office and Lockheed both acted unjustly, and states that Badkin has "no indication in [sic] getting my current career back." *Id*. at 3–7. Badkin closes the letter asking Westbrook to help him and support his grievance. *Id*. at 8. The letter supports an inference that Badkin considers the grievance closed and believes it would have to be reassessed or re-opened in some way in order for him to be reinstated.

Westbrook replied to Badkin by email on April 27, 2017, stating "I sent my request for your return to Lockheed. Hopefully, they will take quick action." Dkt. 26-6 at 2. Relatedly, Badkin declares that he had not received a copy of the written settlement closing his grievance and that the Union had "led [him] to believe that if [he] was

absolved of the assault in the first degree charge and [his] access to Naval Base Kitsap was reinstated, then [he] would be reinstated at [his] previous position." Dkt. 30 at 4. Westbrook's response shows Badkin was not wholly irrational in believing that the parties had agreed to conditions that would permit his reinstatement and that he had fulfilled them. It is also consistent with Badkin's argument that did not and should not have known at this point that the Union had harmed him.

Badkin sent a follow-up email inquiry to Westbrook on May 8, 2017. Dkt. 28 at 9 (citing Dkt. 30 at 13). Westbrook replied later that day explaining that Badkin's misdemeanor plea meant that would not be reinstated because he had not fulfilled the requirement in his Corrective Action Desired block that he be absolved of wrongdoing and stating that "[s]ince you still have a misdemeanor Lockheed has closed the files on your case." *Id.* Badkin declares that this May 8, 2017 email is the first time he was notified that his grievance was closed. Dkt. 28 at 7 (citing Dkt. 30 at 5).[7] Though it is a close question, the Court finds that the evidence is sufficiently unclear that it is possible a reasonable juror could find that Badkin did not know that his grievance was irrevocably closed or that he had a cause of action against the Union until May 2017.

For these reasons, the Court denies Lockheed and the Union's motion for summary judgment on the basis of the statute of limitations.

---

[7] Relatedly, it appears that part of the Union wrongdoing Badkin alleges is poor drafting of the terms of the settlement agreement, but it could be that he did not know exactly what those terms were until this point or slightly later.

### 3. Employer and Union Obligations

To prevail on the merits of a hybrid § 301/fair representation suit, the plaintiff must show both that the employer breached the collective bargaining agreement and that the union breached its duty of fair representation. *Rollins v. Cmty. Hosp. of San Bernadino*, 839 F.3d 1181, 1185 (9th Cir. 2016) (citing *DelCostello*, 462 U.S. at 164–65).

#### a. Employer's Breach of Contract

Badkin alleges that Lockheed breached the CBA by discharging him based on his failure to personally report his absences. Dkt. 1, ¶¶ 25–26. He argues that based on the language of the CBA which Lockheed cited in discharging him, his reporting through his daughter should have been sufficient. Dkt. 28 at 10. Lockheed cited Article 4 Section 2 of the CBA, which provides that "a five working day unreported absence on scheduled workdays without valid justification for failure to report shall be considered a resignation." Dkt. 1 ¶¶ 12–13; Dkt. 22-2 at 24. Badkin also argues that Lockheed should not have coded his termination as a voluntary resignation when his daughter communicated that he did not wish to resign his position. Dkt. 28 at 10–11.[8]

"[Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such question arise in the context of a suit for breach of contract or in a suit alleging liability in tort." *Allis Chalmers Corp.*

---

[8] While the parties also devote a substantial portion of their briefing to Lockheed's defense that it did not breach the CBA because the Navy "effectively terminated Badkin when it revoked his base access," Dkt. 20 at 21, the Court finds that because Badkin has failed to support his claim that Lockheed breached the CBA, it does not need to reach Lockheed's defense.

*v. Lueck*, 471 U.S. 202, 211 (1985). While the parties do not direct the Court to the standards for contract interpretation under federal common law, the Court "may look to general principles for interpreting contracts." *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989) (citing *Saavedra v. Donovan*, 700 F.2d 496, 498 (9th Cir.), *cert. denied*, 464 U.S. 892 (1983)). "The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous." *International Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1406 (9th Cir.1985). "A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation." *Kennewick*, 880 F.2d 1032 (quoting *Castaneda v. Dura–Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981)).

Badkin, as the party contesting Lockheed's interpretation and application of the CBA, must provide evidence of or argument for a contrary reasonable interpretation. Even construing all inferences in favor of Badkin as the nonmoving party, Badkin fails to provide a contrary interpretation that establishes an ambiguity as to the relevant CBA provision. Instead, he argues that Lockheed's policy that employees must personally report absences "is not found in the CBA" and that he was not aware of the policy. Dkt. 28 at 11. Badkin also argues that the existence of Lockheed's policy "is an issue of fact that must be resolved by the jury." Dkt. 28 at 12.

Preliminarily, a jury's factual finding that the policy exists will not resolve the legal issue of whether Lockheed's implementation of the policy represents a breach of contract. Badkin's position appears to be that the CBA prohibits Lockheed from putting any limitations on the term "report" not found in the CBA itself. However, Badkin does

not cite to an integration clause or other basis for the Court to conclude that the CBA prohibits Lockheed from implementing policies not explicitly contained within the CBA's text. Badkin further fails to cite to any evidence from which the Court may conclude that Lockheed's policy is contrary to the intent of the parties in agreeing to the CBA.

While the Court finds both sides have insufficiently briefed the legal issue of a breach of a collective bargaining agreement, on the record as a whole, Badkin has failed to present more than a metaphysical doubt that Lockheed's policy violates the CBA. *See Matsushita*, 475 U.S. at 586. Even if Badkin had not failed to support his breach of contract claim, the Court finds that the Union did not breach its duty of fair representation, so Badkin's claims fail on an alternate basis. *DelCostello*, 462 U.S. at 165 ("To prevail against either the company or the Union, . . . [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union.") (alterations in original) (internal citations omitted).

### b.     Union's Duty of Fair Representation

Because the NLRA allows a single labor union to collectively represent the interests of all employees, that union must "exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *DeCostello*, 462 U.S. at 164 n.14 (quoting *Vaca v. Sipes*, 286 U.S. 171, 177 (1967)). "A union breaches its duty of fair representation when its conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Rollins*, 839 F.3d at 1186 (internal citations and

quotations omitted). "Unions maintain 'wide discretion to act in what they perceive to be their members' best interests,' and [courts] 'accord substantial deference' to the Union's decision" not to pursue a claim. *Id.* at 1188 (quoting *Peterson v. Kennedy*, 771 F.2d 1244, 1253 (9th Cir. 1985)).

The Ninth Circuit stated that it has "never held that a union has acted in an arbitrary manner where the challenged conduct involved the union's *judgment* as to how best to handle a grievance." *Peterson*, 771 F.2d at 539–40 (emphasis added). It later elaborated that the difference between ministerial or procedural acts and acts of judgment is not a dichotomy but a continuum, extending from "procedural imperatives over which a union rarely agonizes by virtue of the fact that they do not necessitate the exercise of much judgment," to "rational attempts on the part of a union to properly interpret a collective bargaining agreement or otherwise handle a grievance." *Peters v. Burlington N. R.R. Co.*, 931 F.2d 534, 539–40 (9th Cir. 1990). Between these poles "lie situations in which a particular union might give the most cursory consideration to or even unaccountably avoid a substantive dilemma," where the union should not be excused for relying on its judgment "when the evidence suggests that it actually exercised neither." *Id.* at 540.

"When a union exercises its judgment, its action 'can be classified as arbitrary only when it is irrational, when it is without a rational basis or explanation.'" *Demetris v. Transport Workers Union of Am., AFL-CIO*, 862 F.3d 799, 805 (9th Cir. 2017) (quoting *Beck v. United Food & Commercial Workers Union, Local 99*, 506 F.3d 874, 880 (9th Cir. 2007)). "Typically, if the challenged conduct involves 'the union's judgment, then

the plaintiff[s] may prevail only if the union's conduct was discriminatory or in bad faith.'" *Id.* (quoting *Burkevich v. Air Line Pilots Ass'n, Int'l*, 894 F.2d 346, 349 (9th Cir. 1990)).

First, "[a] union acts arbitrarily when it simply ignores a meritorious grievance or handles it in a perfunctory manner." *Rollins*, 839 F.3d at 1186 (internal citations and quotations omitted). To avoid acting arbitrarily, a union must at least minimally investigate a grievance. *Id.* at 1186–87. Westbrook declares that he investigated Badkin's grievance through "several conversations with Badkin, a review of documents relating to the termination, discussions with a Lockheed representative, and discussions with the Chief Union Steward, Jamie Nevins." Dkt. 26, ¶ 17. The Court finds that these actions, which Badkin does not dispute, constitute at least minimal investigation. *Rollins*, 839 F.3d at 1186.

Badkin argues that "Westbrook provides no rational explanation why for the 'corrective action desired' he sought relief which provided Badkin with nothing." Dkt. 28 at 14. Badkin cites the Ninth Circuit's reasoning in *Peters*, 931 F.2d at 540, that where "the employee's position has merit, it makes no sense to presume that the union exercised judgment when the evidence suggests otherwise." Dkt. 28 at 14. However, at the time Westbrook drafted the corrective action in the grievance, Badkin believed that he was going to be absolved of all wrongdoing. Dkt. 22-1 at 31. Westbrook declares that he drafted the section based on his conversation with Badkin and asked Badkin to review the entire grievance including the corrective action desired before it was filed to ensure it was accurate. Dkt. 26, ¶ 3. The section reads in part that "[i]f Mr. Badkin is absolved of

wrong doing as provided in the allegations and charges brought against him from this incident, Lockheed Martin will provide a recommendation that his previous clearance and base access be reinstated." Dkt. 26-2 at 2. The evidence that Westbrook drafted the section based on a conversation he had with Badkin at a time at which Badkin believed he was going to be absolved of wrongdoing does not show a dispute of fact whether Westbrook ignored a meritorious position Badkin asked him to advance.

A union reasonably considers a plaintiff's defense when it interviews him extensively, considers other employee statements, deliberates the plaintiff's proffered argument, and can provide an explanation for its decision not to pursue the argument. *Slevira v. W. Sugar Co.*, 200 F.3d 1218, 1221–22 (9th Cir. 2000). Because Badkin argues that the Union "inexplicably conceded the false 'voluntary resignation,'" he may intend to argue that by failing to challenge Lockheed's theory that an employee can be found to have voluntarily resigned despite reporting absences through a family member, the Union failed to consider his defense. However, unlike the plaintiff in *Slevira*, Badkin does not argue or allege that he asked the Union to advance this defense on his behalf. Badkin also fails to present a compelling case that his argument about the absence reporting policy is a particularly strong or obvious one that the Union should have deliberated. *See Peters*, 931 F.2d at 540. The Court cannot conclude that a question of fact exists about whether the Union ignored Badkin's theory when Badkin fails to assert that he actually asked the Union to consider the theory and when the theory is not noticeably contrary to the parties' intent in entering the CBA. Further, the Union's evidence supports a conclusion that it thoroughly considered the issues surrounding Badkin's grievance. Badkin's

evidence fails to go beyond hindsight and speculation and does not create a material dispute of fact about whether the Union irrationally failed to advance an obvious argument in his favor. *Demetris*, 862 F.3d at 805.

Regarding the terms on which the Union settled his grievance, Badkin argues that the Union acted arbitrarily by "inexplicably conced[ing] the false 'voluntary resignation,'" obtaining nothing in his favor, and actually leaving him worse off by requiring him to be cleared of all charges to reapply as an external candidate, when there were positions he could apply to as an external candidate which were not contingent on his being cleared of all charges. Dkt. 28 at 15. He argues that the Union reached this settlement without notifying him, implying but not arguing that he would have asked them to pursue different terms at the point of settlement. *Id*. Badkin does not put forward an alternative designation the Union should have pursued other than "voluntary resignation" and does not explain why another designation would have been more favorable.

While Badkin disputes whether the settlement terms were in his favor, the Court finds that settling a grievance after substantial negotiation and consultation with legal counsel falls decisively within the Union's exercise of judgement—its "rational attempts . . . to properly interpret a collective bargaining agreement or otherwise handle a grievance." *Peters*, 931 F.2d at 539–40. Because the Union was exercising judgment, its action can be found arbitrary only when irrational. *Demetris*, 862 F.3d at 805. Courts do not find that unions are liable for "good faith, non-discriminatory errors of judgment made in the processing of grievances." *Peters*, 931 F.2d at 539 (citing *Peterson*, 771 F.2d

at 1254). Westbrook declares that while the Union was negotiating with Lockheed over a period of months, attempting to negotiate a settlement that would allow Badkin to be reinstated, Badkin pled to the misdemeanor charge, and the Union was "unable to convince Lockheed to improve upon the settlement offer [Badkin] had previously rejected." Dkt. 26, ¶¶ 6–7.[9] Westbrook then had to decide whether to "move the grievance to arbitration or settle it over [Badkin's] objection." *Id*. ¶ 7. Westbrook declares that he carefully evaluated the impact of Badkin's plea on the requested remedy in the grievance and was concerned that even if the Union won in arbitration, Badkin "would still not be returned to work because he had not been 'absolved.'" *Id*. ¶ 8. Westbrook consulted with legal counsel and made a final decision not to take the grievance to arbitration, deciding that "the settlement was the best outcome for the grievance." *Id*. ¶ 9. Moreover, on the particular point that it could be arbitrary for the Union to agree to a settlement that required Badkin to be cleared of all charges at the point when Badkin had already pled to the misdemeanor charge, Westbrook declares that the plea occurred while negotiations were taking place and that he and Nevins "were unable to convince Lockheed to improve upon the settlement offer that [Badkin] had previously rejected." Dkt. 26, ¶ 7. While Badkin argues that this condition of the settlement agreement left him worse off than he was before the settlement, Badkin fails to present evidence from which

---

[9] Badkin argues that at this point the Union had led him to believe he would be reinstated if absolved of the assault charge, Dkt. 28 at 6 (citing Dkt. 30 at 4–5). However, he does not submit facts to support how he developed this belief, or address this fact in the argument section of his brief which addresses the Union's breach of its duty—he does not ask the Court to hold the Union responsible for the impact of his plea on the settlement efforts or argue that he would have handled the criminal charges differently absent his belief.

a reasonable juror could conclude that the Union acted in an arbitrary or perfunctory manner, rather than exercising its judgment in an evolving situation.

Unlike the union in *Peters*, the Union here did not "inexplicably ignore a strong substantive argument" that was critical to the success of Badkin's grievance. *Peters*, 931 at 540. At most, Westbrook's belief that the best available remedy was a settlement that Badkin believes did not improve his circumstances amounts to error in judgment, not an "egregious" failure which "transcends mere negligence." *Peters*, 931 F.2d at 539. The available evidence shows that Badkin asked the Union to pursue reinstatement and that the Union made a reasonable, good-faith effort to pursue that goal. The Court concludes that on the record before it, no reasonable juror could hold that the Union's exercise of judgment in negotiating the terms of the settlement was irrational or without explanation.

Badkin fails to present facts from which a reasonable juror could conclude the Union treated his grievance in a perfunctory or arbitrary manner, failed to investigate it, or ignored a potentially meritorious argument he asked them to advance. Therefore, the Court finds the Union did not breach its duty of fair representation by handling Badkin's grievance arbitrarily.

Second, "[t]o establish that the union's exercise of judgment was in bad faith, the plaintiff must show 'substantial evidence of fraud, deceitful action or dishonest conduct.'" *Beck*, 506 F.3d at 880 (quoting *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 299 (1971)). The Union argues that Badkin "has no facts supporting a claim of bad faith or hostility by the Union" and that Badkin testified in his deposition that he had no reason to believe Westbrook or Nevins had ill will toward him. Dkt. 24 at 18 (citing

Dkt. 22-1 at 334). Lockheed makes the same argument. Dkt. 20 at 21. Badkin argues that "[t]he jury will likely also find that the Union acted in bad faith by secretly settling Badkin's grievance and never informing Badkin of the settlement." Dkt. 28 at 16.  In reply, the Union points out that Westbrook shared the settlement terms with Badkin in July 2016, so the terms were not secret. Dkt. 31 at 6 (citing Dkt. 26, ⁋ 5). That Badkin had a different understanding of the terms does not amount to substantial evidence of fraud or deceit. *Beck*, 506 F.3d at 880.

The Union also argues that its failure to provide Badkin a copy of the final agreement was negligence at most. Dkt. 31 at 6. As the Union correctly argues, "negligent union conduct does not rise to the level of bad faith." Dkt. 31 at 6 (citing *Demetris*, 862 F.3d at 808). Moreover, Westbrook declares that he told Badkin about the outcome of the grievance at the September meeting, and his emails with Nevins demonstrate his intent to do so. Dkt. 26, ⁋ 11; Dkt. 26-4 at 2 ("I only have a short message to give him that the union is not progressing the grievance and that the grievance doesn't have merit according to our attorney"). Though there is a dispute of fact about what Badkin was told or what he understood at the September meeting, no facts suggest Westbrook or Nevins made any deceitful or dishonest statements.  The Court finds that no reasonable juror could conclude Badkin has shown "'substantial evidence of fraud, deceitful action or dishonest conduct.'" *Beck*, 506 F.3d at 880. Therefore, the Court finds that the Union did not breach its duty of fair representation by acting in bad faith.

Finally, the Ninth Circuit holds that to prove a union's exercise of judgment was discriminatory "a plaintiff must adduce substantial evidence of discrimination that is

intentional, severe, and unrelated to legitimate union objectives." *Addington v. US Airline Pilots Ass'n*, 791 F.3d 967, 984 (9th Cir. 2015) (internal citations omitted). Badkin testified at his deposition that while he did not believe Nevins or Westbrook had any ill will or hostility toward him, he believed that they discriminated against him based on "their inactions in communicating." Dkt. 22-1 at 83. Lockheed argues that these statements and others show a lack of evidence of discrimination such that no reasonable jury could find for Badkin. Dkt. 20 at 24. The Union cites Badkin's testimony in deposition that "when you pay somebody to help you and they don't and they ignore you, it's hard to think they might be looking out for your best interests" and that "they were discriminatory maybe towards all their customers or all their – all the people, or maybe they're selectively discriminatory. Or maybe it's a matter of, you know, just not really caring or overlooking it," arguing that Badkin's opinion "fails to rise to the level required under binding precedent for a legal finding of discrimination." Dkt. 24 at 18–19 (citing Dkt. 22-1 at 83).

Badkin's response brief does not discuss this deposition testimony or argue the Union discriminated against him. *See* Dkt. 28 at 13–16. The Court finds that Badkin fails to present substantial evidence that the Union discriminated against him. *Addington*, 791 F.3d at 984. Therefore, the Court finds that the Union did not breach its duty of fair representation by handling Badkin's grievance in a discriminatory manner.

In sum, the Court finds that Badkin has failed to show a dispute of material fact about whether the Union breached its duty of fair representation. Therefore, his claims cannot prevail against either the Union or Lockheed. *DelCostello*, 462 U.S. at 165.

# IV.  ORDER

Therefore, it is hereby **ORDERED** that Lockheed's motion for summary judgment, Dkt. 20, and the Union's motion for summary judgment, Dkt. 24, are **GRANTED**.

The Clerk shall enter a **JUDGMENT** and close the case.

Dated this 22nd day of May, 2019.

_____
BENJAMIN H. SETTLE
United States District Judge